# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAGAA BENJAMIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) **CIVIL ACTION NO. 07-cv-5518** ) ) |
| vs. | ) ) |
| NETLIST, INC., CHUN K. HONG, CHRISTOPHER LOPES, JAYESH BHAKTA, PAIK KI HONG, NAM KI HONG, THOMAS F. LAGATTA, ALAN H. PORTNOY, DAVID M. RICKEY, PRESTON ROMM, THOMAS WEISEL PARTNERS LLC, NEEDHAM & COMPANY, LLC, and WR HAMBRECHT + CO., LLC, | ) CLASS ACTION COMPLAINT ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiff, Ragaa Benjamin ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Netlist, Inc. ("Netlist" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the common stock of Netlist, who purchased or otherwise acquired Netlist's common stock pursuant or traceable to the Company's November 30, 2006 Initial Public Offering (the "IPO" or the "Offering") through April 16, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      Netlist is a designer and manufacturer of high performance memory subsystems, which are sold to original equipment manufacturers ("OEMs") in the server, high performance computing, and communications markets.  The Company's memory subsystems are incorporated into multiple platforms at IBM, Dell, Gateway and Hewlett-Packard and other OEMs.

3.      On November 30, 2006, the Company conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company, as it was able to raise $43.750 million by selling 6.25 million shares of stock to the public at a price of $7.00 per share.  Pursuant to the IPO, Company insiders, known as "selling stockholders," were also eligible to sell up to 937,500 shares of Company stock, of which they initially planned to sell 812,500 shares, or 86 percent of the available allotment.  At the time of the IPO, the selling stockholders sold all 937,500 shares, for gross proceeds of over $6.562 million, $3.7 million of which was received by Defendant C. Hong alone.

4.      On April 16, 2007, the Company shocked investors when it reported its preliminary First Quarter 2007 financial results.  On this day, the Company disclosed for the first time that its operating results were going to be dramatically lower than investors were lead to believe.  This was primarily due to an oversupplied dynamic random access memory ("DRAM")

market, which in turn affected the Company's pricing and gross margins on its products. Additionally, the Company revealed that it had experienced a lower than expected demand for its high-end products from its largest customers due to excess inventory concerns, which had also significantly reduced demand for the Company's products.

5.     On this news, shares of the Company's stock declined over 28 percent, or $1.68 per share, to close on April 17, 2007 at $4.29 per share, on unusually heavy trading volume.

6.     The Complaint alleges that, in connection with the Company's IPO, defendants failed to disclose or indicate the following: (1) that the Company's growth and operational strategies were materially flawed; (2) the Company was already experiencing the effects of an oversaturated memory chip market, and that demand for the Company's products had deteriorated substantially; (3) that the Company's products were not unique or well positioned in the market; (4) that the Company encouraged its largest customers to order and maintain excess inventory so that the Company would appear financially stable; (5) that due to these excessive inventory levels, the Company's two largest customers would be forced to slash their product orders to return to acceptable levels; (6) that the Company maintained a flawed pricing strategy for its products and had limited visibility as to future product pricing; (7) that the Company's profit margins were quickly eroding in the memory chip market; (8) that an inadequate due diligence investigation was conducted into the Company prior to its IPO; (9) that the Company lacked adequate internal controls, and (10) that, as a result of the foregoing, the Company's Registration Statement was false and misleading at all relevant times.

7.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

10.      Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act.   Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.   Additionally, the Company's IPO was actively marketed in this Judicial District.

11.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.      Plaintiff, Ragaa Benjamin, as set forth in the accompanying certification, incorporated by reference herein, purchased Netlist's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

13.      Defendant Netlist is a Delaware corporation with its principal place of business located at 475 Goddard, Irvine, California.

14.      Defendant Chun K. Hong ("C. Hong") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors.

15.    Defendant Christopher Lopes ("Lopes") was, at all relevant times, the Company's Vice President of Sales.

16.    Defendant Jayesh Bhakta ("Bhakta") was, at all relevant times, the Company's Chief Technology Officer.

17.    Defendant Paik Ki Hong ("P. Hong") was, at all relevant times, the Company's Vice President of Procurement.

18.    Defendant Nam Ki Hong ("N. Hong") was, at all relevant times, a member of the Company's Board of Directors.

19.    Defendant Thomas F. Lagatta ("Lagatta") was, at all relevant times, a member of the Company's Board of Directors.

20.    Defendant Alan H. Portnoy ("Portnoy") was, at all relevant times, a member of the Company's Board of Directors.

21.    Defendant David M. Rickey ("Rickey") was, at all relevant times, a member of the Company's Board of Directors.

22.    Defendant Preston Romm ("Romm") was, at all relevant times, a member of the Company's Board of Directors.

23.    Defendants C. Hong, Lopes, Bhakta, P. Hong, N. Hong, Lagatta, Portnoy, Rickey, and Romm are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Netlist's quarterly reports, press releases, documents, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports, press releases, and documents alleged herein to be misleading prior to or shortly after their issuance

and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24.    Defendants Thomas Weisel Partners LLC ("Thomas Weisel"), Needham & Company, LLC ("Needham"), and WR Hambrecht + Co., LLC ("WR Hambrecht") served as underwriters of the Company's IPO, and served as financial advisors and otherwise assisted in the preparation of Netlist's IPO documents. Defendants Thomas Weisel, Needham, and WR Hambrecht are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.    Netlist is a designer and manufacturer of high performance memory subsystems, which are sold to original equipment manufacturers ("OEMs") in the server, high performance computing, and communications markets. The Company's memory subsystems are incorporated into multiple platforms at IBM, Dell, Gateway and Hewlett-Packard and other OEMs.

26.    In preparation for the IPO, the Company issued a press release entitled "Netlist, Inc. Prices Initial Public Offering." Therein, the Company, in relevant part, stated:

> Netlist, Inc. (NASDAQ: NLST) today announced the pricing of the initial public offering of its common stock. Netlist sold 6,250,000 shares in the offering at a price of $7.00 per share. Certain selling stockholders have granted the underwriters the right to purchase up to 937,500 shares of Netlist's common stock from the selling stockholders at the initial public offering price solely to cover

over-allotments. Netlist's common stock will be listed on the NASDAQ Global Market under the symbol "NLST."

Thomas Weisel Partners LLC acted as sole bookrunning manager for the offering. Needham & Company, LLC and WR Hambrecht + Co acted as co-managers. A copy of the final prospectus relating to the offering may be obtained by contacting Thomas Weisel Partners LLC by mail at One Montgomery Street, San Francisco, CA 94104, or by telephone at (415) 364-2720.

27.    On November 30, 2006, the Company conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company, as it was able to raise $43.750 million by selling 6.25 million shares of stock to the public at a price of $7.00 per share.  Pursuant to the IPO, Company insiders, known as "selling stockholders," were also eligible to sell up to 937,500 shares of Company stock, of which they initially planned to sell 812,500 shares, or 86 percent of the available allotment.   At the time of the IPO, the selling stockholders sold all 937,500 shares, for gross proceeds of over $6.562 million, $3.7 million of which was received by Defendant C. Hong alone.

**Materially False and Misleading**
**Statements Made in the Registration Statement**

28.    Regarding the Company's differentiation from its competitors, and the unique characteristics of Company's products, the Registration Statement, in relevant part, stated:

> We design and manufacture high performance memory subsystems. We sell our subsystems to original equipment manufacturers, or OEMs, in the server, high performance computing and communications markets. Within these markets, we target applications in which memory plays a key role in enabling overall system performance. Our memory subsystems are incorporated into multiple platforms at International Business Machines Corporation, or IBM, Dell Inc., Gateway, Inc., Lenovo Group Limited, or Lenovo, and Hewlett-Packard Company.

* * *

7

**Our memory subsystems offer differentiated features and performance characteristics.** For example, our innovative printed circuit board, or PCB, designs enhance signal integrity, allowing our customers to design and market products that operate at the highest commercially available speeds. Another technique we utilize is to embed passive devices within the PCB, thereby freeing valuable board space to reduce form factors and improve signal integrity. Our solutions also address system-level thermal issues encountered at high operating speeds through such innovations as planar designs and proprietary heat dissipation technologies. [Emphasis added.]

29.    Regarding the Company's growth strategy and its relationships with its customers,

the Registration Statement, in relevant part, stated:

Our objective is to be the leading provider of high performance memory subsystems. Key elements of our strategy include:

• **Further Sales Penetration of Existing Customers.** **We have established deep relationships, and qualified our products, with leading OEMs.** Our current OEM customers have a large and diverse portfolio of system platforms that require high performance memory subsystems. We believe we have an attractive opportunity to provide them with memory solutions for a greater number of their existing and future platforms.

• *Establish Relationships with New Customers.* We will continue to dedicate significant sales and marketing resources to establish new relationships with industry-leading OEMs for whom memory subsystem performance is a key determinant of overall system performance.

• *Target New Applications and Product Opportunities.* We currently rely on the server market for most of our revenues. We intend to develop additional memory solutions, using both volatile (DRAM) memory, which does not retain data after system power is shut off, and non-volatile (flash) memory, which does, based on our core technology capabilities. In particular, we intend to develop flash memory solutions to penetrate the communications, industrial and embedded systems markets.

• *Continue to Invest in the Development of Proprietary Technology.* We intend to actively expand our intellectual property portfolio and engineering capabilities by investing in

research and development. One targeted area of technology development is the design of custom logic ICs that can be used in memory modules to provide value-added features.

- *Establish International Operations and Manufacturing Capabilities.* We plan to establish a manufacturing facility in China during the first half of 2007. We believe that this will allow us to better support leading OEMs with design and manufacturing sites in China, lower our production costs and provide access to new pools of engineering talent. [Emphasis added.]

30. Regarding the Company's sales and marketing strategy, the Registration Statement, in relevant part, stated:

**Sales and Marketing**

We market and sell our products through a direct sales force and a network of independent sales representatives. Our sales activities focus primarily on developing strong relationships at the technical, marketing and executive management levels within market-leading OEMs. These OEMs design systems for a variety of applications that require a significant number of high performance memory subsystems, representing substantial opportunities for us. We have been successful in developing OEM relationships through our ability to provide high performance memory subsystems. Our direct sales group and field application engineers work closely with our OEM customers at an early stage of their design cycles to solve their design challenges and to design our products into their systems.

We believe in the timely communication and exchange of information with our customers. We utilize well-trained, highly technical program management teams to successfully drive new product development and quickly respond to our customers' needs and expectations. Our program management teams provide quick response times and act as a single point-of-contact for routine issues during the sales process. Additionally, they address the long-term business and technology goals of our customers. We employ a team approach to business development whereby our sales team and independent representatives identify, qualify and prioritize customer prospects through offices in a number of locations worldwide.

31.    Regarding the Company's market leading position with its unique products, and the Company's ability to capture additional market share, the Registration Statement, in relevant part, stated:

**The Traditional Memory Supply Chain Cannot Deliver High Performance Memory Solutions**

Memory ICs are typically assembled together on a card, or module, before being incorporated into electronic systems. Memory modules save valuable motherboard space in an electronic system, allow for the use of different types and densities of memory in the same system, and facilitate subsequent upgrading of the memory to a different type or density. According to iSuppli, a market research firm, the global DRAM module market was $21.4 billion in 2005, representing 86% of the total DRAM market.

Most DRAM memory modules sold to OEMs have traditionally been produced by the same companies that manufacture DRAM ICs. In an effort to continually reduce costs and achieve higher memory densities, DRAM manufacturers typically operate their own fabrication facilities and use leading edge manufacturing processes, which require multi-billion dollar capital investments. **To maximize capacity utilization and reduce unit costs, DRAM manufacturers have historically focused on the highest volume applications, such as PCs, to recoup their investments. Memory modules used in PCs employ industry standard configurations, are largely commoditized, and require limited systems expertise to develop.** Therefore, DRAM manufacturers generally have not focused on developing the systems expertise necessary to produce application-specific memory subsystems that incorporate small form factors, high speed, optimal thermal characteristics and signal integrity.

DRAM manufacturers have historically attempted to address increased demands for memory in electronic systems by developing new generations of memory ICs with increased density. For example, the density of a 1 gigabyte memory module comprised of eighteen 512 megabit ICs can be doubled to 2 gigabytes by using eighteen 1 gigabit ICs. **This approach of using next-generation ICs, however, can be problematic for OEMs.** When first introduced, next-generation DRAM ICs are only available in limited supply and typically command a premium price on a per-byte basis compared to current-generation DRAM

ICs. Next-generation DRAM ICs can sell at prices up to ten times higher than current-generation ICs at introduction, and it may take as long as five years to achieve price parity between the generations. **Thus, the increasing demand for higher density memory solutions exceeds the pace at which memory IC manufacturers are able to cost-effectively produce next-generation memory ICs and reduce the cost of current-generation memory ICs. One approach to addressing the need for high density memories in a more cost-effective manner is the stacking of memory ICs, or chip-stacking.** Chip-stacking is a process in which DRAM ICs are stacked prior to assembly of the memory subsystem. For example, a 4 gigabyte memory module can be made with 36 stacks of two 512 megabit ICs. While it can be less expensive than non-stacked solutions, stacking costs can still constitute a significant portion of the cost of materials for a memory module.

**Other industry dynamics are reducing the DRAM manufacturers' focus on the high density DRAM subsystems market. In an effort to achieve greater diversification and profitability, the largest DRAM manufacturers have dedicated increasing design resources and manufacturing capacity to non-DRAM products such as flash memory and complementary metal oxide semiconductor**, or CMOS, image sensors, further decreasing their desire and ability to supply high performance, application-specific memory subsystems that may sell in relatively low volumes. **In addition, an increasing portion of global DRAM supply is being manufactured by integrated device manufacturers and third party foundries that lack back-end capability beyond wafer fabrication.** In contrast to traditional DRAM manufacturers with fully integrated operations, these companies generally lack the internal packaging and assembly capabilities to produce modules. **The most recently established DRAM manufacturers have focused on commodity-driven, mass-production business models rather than the memory module market.**

## A Need for High Performance Memory Subsystem Suppliers Exists Today

Historically, many OEMs designed and manufactured their memory ICs and subsystems in-house. **However, the increasing complexity of systems, proliferation of different platforms, continuing evolution of industry standards, increasing need for customization and OEM desire to reduce capital investments are driving OEMs to purchase ICs and subsystems from specialized suppliers focused on developing innovative**

**subsystem solutions.** These suppliers require extensive systems expertise to engage with the OEM customer throughout the product development cycle to produce a highly differentiated memory solution that addresses the issues and constraints specific to a particular high-end system. **Since industry-standard products are inadequate, these solution providers must employ innovative technologies, such as efficient planar design, alternative packaging techniques and custom semiconductor logic design capabilities, to develop memory subsystems customized for OEMs' specific systems.** OEMs also require these suppliers to meet a number of additional criteria beyond innovation, such as low cost, rapid time-to-market and high product quality. [Emphasis added.]

32.    Regarding the Company's business model and operational "solution," the

Registration Statement, in relevant part, stated:

### Our Solution

**We provide high performance memory subsystems to the server, high performance computing and communications markets.** We utilize our innovative and proprietary technology, as well as our extensive systems expertise, to bridge the gap between industry standard approaches and the requirements of complex OEM systems. Our application-specific solutions provide customers with the following key benefits:

***Highly Differentiated Memory Solutions Through Deep Customer Engagement.* We work closely with our OEM customers, from the earliest stages of new product definition through the ramp up to mass production, to develop and deliver application-specific memory subsystems which address the full range of system architecture and performance requirements. Our close, collaborative relationships with our OEM customers give us early insight both into their current needs and into future technology trends.** In addition, our in-depth systems expertise, coupled with our ability to customize solutions, enables our OEM customers to offer differentiated products that feature high levels of performance while improving reliability and, in some cases, reducing cost.

***High Performance Through Proprietary Technologies and Design Techniques.* We have developed a portfolio of proprietary technologies and design techniques to achieve optimal electronic signal strength and integrity, high memory density and improved heat dissipation.** For example, our

12

innovative printed circuit board, or PCB, designs enhance electronic signal integrity, allowing our customers to design and market products that operate at the highest commercially available speeds, such as the DDR2 specification, which is designed to operate at speeds up to 800 MHz. Another technique we utilize is to embed passive devices within the PCB, thereby freeing valuable board space to reduce form factors and improve signal integrity. Our solutions also address the system-level thermal issues encountered at high operating speeds via such innovations as planar designs and proprietary heat dissipation technologies that allow us to minimize heat concentrations within the system.

*High Quality and Reliability.*   We perform a full range of product reliability testing and share the results with our customers on an on-going basis. We use advanced design tools to simulate accurately the system performance targets of our customers and to ensure that our products comply with our customers' specifications. All of our memory subsystems undergo both functional and system burn-in testing prior to delivery to our customers. We complement our test capabilities with advanced imaging technology to inspect the quality of our micro ball grid array, or microBGA, assemblies. We believe that our testing procedures significantly enhance the quality and reliability of our products.

***Rapid Order Fulfillment Capability.* We operate our manufacturing facility in a manner that maximizes our ability to meet changing customer demand. Our turn-around times are typically one week or less, and in some cases as few as two days, which allows us to match unforeseen customer demand and to provide our OEM customers with timely access to products.**

***Cost-Effective Memory Solutions.* We provide high performance memory subsystems at what we believe to be the lowest cost per bit for many applications.** Our portfolio of proprietary technologies and design techniques allow us to use cost-effective, current generation DRAM ICs and in some cases avoid additional costs from chip-stacking to significantly lower the cost of our memory subsystems. Additionally, the superior thermal characteristics and electronic signal integrity of our subsystems helps OEMs reduce costs through simplified system design. [Emphasis added.]

33.    Regarding the Company's internal controls, procedures, and accounting policies,

the Registration Statement, in relevant part, stated:

### SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America.

\* \* \*

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of the assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Significant estimates made by management include, among others, provisions for uncollectible receivables and sales returns, valuation of inventories, recoverability of long-lived assets and realization of deferred tax assets.

\* \* \*

**Critical Accounting Policies**

**The preparation of our consolidated financial statements in conformity with accounting principles generally accepted in the U.S. requires us to make estimates and assumptions** that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of net sales and expenses during the reporting period. By their nature, these estimates and assumptions are subject to an inherent degree of uncertainty. **We base our estimates on our historical experience, knowledge of current conditions and our beliefs of what could occur in the future considering available information. We review our estimates on an on-going basis.** … [Emphasis added.]

34.    Regarding the Company's recent change in independent accounting firms, the

Registration Statement, in relevant part, stated:

### Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

In December 2005, we dismissed Deloitte & Touche LLP as our independent registered public accounting firm and engaged Corbin and Company, LLP as our independent registered public accounting firm. Our board of directors approved this change.

Prior to the dismissal, we did not consult with Corbin and Company, LLP regarding the application of accounting principles to a specific completed or contemplated transaction or any matter that was either the subject of a disagreement or a reportable event. We also did not consult with Corbin and Company, LLP regarding the type of audit opinion that might be rendered on our consolidated financial statements.

Deloitte & Touche LLP's report on our consolidated financial statements as of January 1, 2005, and for each of the two years in the period ended January 1, 2005, did not contain an adverse opinion or disclaimer of opinion, nor was it modified as to uncertainty, audit scope, or accounting principles. There were no disagreements with Deloitte & Touche LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure.

35.    Regarding the "Lock-up Agreements" between the Company and the selling

stockholders, the Registration Statement, in relevant part, stated:

### Lock-up Agreements

We and the selling stockholders, our executive officers and directors and substantially all of our other existing security holders have agreed, subject to limited exceptions, not to offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any of their shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock; or enter into any swap or other arrangement that transfers to another, in whole or in part, any

economic consequences of ownership of our common stock (other than with respect to shares being sold by a selling stockholder in this offering) during the period ending 180 days after the date of this prospectus without the prior written consent of Thomas Weisel Partners LLC, on behalf of the underwriters. If (a) during the last 17 days of this 180-day period, we release earnings results or announce material news or a material event or (b) prior to the expiration of this 180-day period, we announce that we will release earnings results during the 15-day period following the last day of the 180-day period, then in either case the above restrictions will continue to apply until 18-days after the date of release of the earnings results or the announcement of the material news or material event, as applicable, unless Thomas Weisel Partners LLC waives, in writing, such extension. These restrictions apply to shares of our capital stock which are now owned or which are acquired after the date of this prospectus by the person executing the lock-up agreement, or over which that person later acquires the power of disposition.

36.    Defendant C. Hong was scheduled to present at Needham & Company's Ninth Annual Growth Conference on January 12, 2007.  In anticipation of his presentation, the Underwriter Defendants published a series of analyst reports about the Company, all of which indicated that the Company's stock was well positioned to experience substantial appreciation. On January 9, 2007, Defendant WR Hambrecht initiated its coverage of the Company with a "Buy" rating, and Defendant Thomas Weisel initiated its coverage of the Company with an "Overweight" rating, which means that the analyst is advising clients to buy shares of the stock. The following day, on January 10, 2007, Defendant Needham also initiated its coverage of the Company with a "Buy" rating.

37.    On January 12, 2007, Defendant C. Hong presented at Needham's Growth Conference.  With regard to the Company's projected growth, Defendant C. Hong, in relevant part, stated:

> Good morning. Thank you for attending. So we will go through a basic company overview. Hopefully we will cover this in 25 minutes and then we will breakout with questions. **We are fairly newly public, having gone public at the end of November. And**

so the information that you see here is pretty much what we covered during the road show about a month ago.

So, looking at why you would invest in Netlist – we are a leader in high-performance memory. It's a very large market which is growing rapidly. It's a $4.4 billion market, which is the high-density memory market, which we define as 1 GB memory and above. We, in a short period of time, have built up quite a broad portfolio of IP, which we leverage to provide solutions to our end customers. We have strong relationships with our OEM customers -- like IBM, Dell, Hewlett-Packard. And we believe that this is a highly scalable business model and we have just begun to tap the potential of the model. And we are experiencing rapid growth in both revenues and gross margins. [Emphasis added.]

38.    During the January 12, 2007 presentation, Defendant C. Hong also distinguished

Netlist from its competitors, and illustrated the Company's marketing strategy.   Defendant C.

Hong, in relevant part, stated:

So, it's a very large market and you ask why is a Company of our size -- why we could be successful in this market? Who would -- who was addressing this business all along? The traditional supply base for both PC and server memory over the years has been the silicon manufacturers -- DRAM's, such as Samsungs, Microns and the Kimondas of the world. They represent today our supply base. But simply put, these guys have been slow to keep up in terms of the density migration. So, for example 10 years ago, DRAM densities used to quadruple at a dye level -- at a chip level every couple of years. Now it's taking them probably five to six years to just double the density. So when that happens that requires more packaging -- it forces the industry to cram more and more chips into a given space which then causes thermo-mechanical, electrical issues, which we are in the business of solving. So what used to be a pretty simple 3 to 8-chip, 9-chip, 18-chip modules, now we are having to create 36, 72 chip cards and boards, which are very elaborate. So what we have depicted here is a performance gap between what the OEM server manufacturers require in terms of performance versus what the silicon manufacturers can deliver today.

So we are in the business of filling this performance gap. We take the same commodity off-the-shelf DRAM's that are used to deliver memory into the PC space and with the use of our IP board level and packaging IP, we then create high-

17

**performance memory subsystems, which we deliver into the server and workstation space.**  [Emphasis added.]

39.    Additionally, during the January 12, 2007 presentation, Defendant C. Hong stated that Netlist was insulated from pricing volatility due to the relationships that the Company fostered and maintained with its customers.  Defendant C. Hong, in relevant part, stated:

> **So, that's an example of how we engage our customers early on with IP. Without IP it would be difficult to get in front of the design and the platform engineers.**
>
> **By contrast, our competitors -- many of our competitors engage with more of a commodity orientation after the systems have been released.** At that point they have to use pricing availability as differentiators. And data shows that we have been able to increase our gross margins over time as we engage earlier on in the product lifecycle.
>
> **And so, this is another slide on IBM and this is an example of how we get in earlier on with IP then grow the business over time.** In '03 we started again the blade development with them. But before they can get us onto servers they wanted to see a track record of quality and delivery so they brought us in to support their ThinkPad platform in '04. At that point we became the first new memory suppliers that they had brought in, in six years. Then in '05 we started to deliver the VLP's in volume and that -- we recorded about $25 million in revenues. At the same time we started to diversify away -- diversify into other platforms, such as the medical tablet. **We are working with the higher end systems.** They're all mainframe where there is a lot of custom memory today. In '06 we were able to double the business and we plan to continue to grow this business at IBM **So this is a kind of a road map of how we would like to -- we plan to grow our businesses at other leading OEMs, such as HP. You get in with IP on a particular high-end platform and then you start to establish -- you establish your track record in terms of high-volume delivery on commodity high-volume products and then over time continue to diversify into the higher end systems.** [Emphasis added.]

40.    During the January 12, 2007 presentation, Defendant C. Hong also provided the same guidance that he provided to investors just prior to the Company's IPO.    Defendant C. Hong, in relevant part, stated:

> **In the bottom you see the quarterly numbers steadily increase over the last six quarters. And that is a result of adding new customers such as IBM, HP and Apple. And so, we look forward to continuing this growth trend over the next year.**
>
> **This slide is looking at how we have been able to diversify our revenues, as I mentioned. Until '04 we were really a one customer Company** with Dell being the primary customer. We were supplying into, as we are today, still into their PowerEdge Server. Within Dell, we have been able to diversify now into notebooks as well as workstations and into their storage area. **So through the course of the last couple of years, we've diversified not only into other customers, but also within each individual account we've been able to diversify.**
>
> You see here the addition of Apple and HP really starting in the second half of last year. Also, Gateway, Lenovo, Crucial, [Hanhai]. We expect a couple of these customers to become 10% customers through the course of this year -- by the end of this year.
>
> **Here, you see our margin trend over the last seven quarters.** Both gross margins in the red on the top line and operating margins. The top line -- the gross margin increase the steady increase is really a function of a couple of things. One as we've been able to utilize more and more of our capacity through '05 with the decline in the Dell business, we've ran our facility less than optimally, which led to higher cost. And as the factory utilization increased, that led to higher -- lowering of our costs and increasing of our gross margins. **Also importantly, is the penetration into the higher margin applications through the course of the last year. The operating margin increase reflects the fact that this model is highly leverageable. Once you start covering the FX overhead, a lot of the profit that is generated drops to the operating income line.**
>
> Here you see a spectrum of applications on one side and customers on the other. And it's a margin spectrum. On the one end you see laptops, which are fairly commodity. We do mostly a higher end portion of the laptop memory -- 1 GB and above. But today, the

bulk of our business is servers, workstations and laptops at these OEMs. Over time, we plan to take our IP and get into the high-performance computing, supercomputer, telecom and industrial space, where products are more customized, they represent higher margins and fairly longer product lifecycles.

**This is our target financial model, looking out two to three years. We expect to again increase our gross profit with the penetration of the more higher margin type of applications.**

Also moving our manufacturing into China will do a couple of things for us. It will lower, obviously, the overhead but more significantly it will probably improve our gross margins by a few percentage points from improvements in raw material costs, namely DRAM costs. [Emphasis added.]

41.    On January 12, 2007, the same day that Defendant C. Hong presented at Needham's Growth Conference, he was interviewed by *TheStreet.com*.  During his interview broadcast over the Internet, Defendant C. Hong, in relevant part, stated:

- We believe our IP differentiates us [from competitors] which allows us to pack a lot more a lot more memory into a given space. So that these servers can handle a lot more Internet traffic or business environment.

- [Netlist] should not get lumped in with the ordinary chip manufacturer sector the sector, which was flat last year [2006], since the Company is in the high-end memory category, that sector has done much better than the overall chip sector in the last nine months. Products are relatively short today, [and] there [is] not enough chip capacity to fulfill the memory requirements of all the OEMs that are out there. And Netlist is there to capture the spilloff and catch it from overloading.

- [The Company is seeing] good demand from the IT infrastructure manufacturers, especially in [the Company's] space we see strong demand for high end memory.

42.    During the January 12, 2007 interview with *The Street.com*, Defendant C. Hong also spoke about the Company's internal controls and corporate governance, stating, in relevant part:

- We've been in business for about six years, [and] from the get go we have had good counsel and good setup of the Company, [good corporate governance], and we have a very strong Board of Directors today.

- When we went public, we made sure things were in order, and things are just fine with us.

43.    On February 1, 2007, the Company issued a press release entitled "Netlist Reports 2006 Fourth Quarter, Year-End Results; Revenue Growth, Rising Margins Drive Profits for Quarter and Year."  Therein, the Company, in relevant part, stated:

> Netlist, Inc. (Nasdaq: NLST) today reported financial results for its fiscal fourth quarter and year ended December 30, 2006.
>
> Revenues for the fourth quarter rose 80 percent to $42.0 million from $23.3 million in the 2005 fourth quarter, and gross margin for the quarter increased to 16.2 percent from 8.1 percent in the corresponding prior-year period. Net income for the 2006 fourth quarter was $2.0 million, or $0.12 per diluted share, compared to a net loss of $304,000, or a $0.02 loss per diluted share, in the corresponding prior-year period. Fully diluted weighted-average shares outstanding for the 2006 fourth quarter were 16,793,000, compared with 10,673,000 in the prior-year period. These results include stock-based compensation expense of $145,000 in the fourth quarter of 2006 and a credit of $6,000 in the fourth quarter of 2005.
>
> Chief Executive Officer Chuck Hong commented: **"We are encouraged with both the quarterly and yearly financial results, not only because they represent strong growth and profitability, but also because they result from stronger demand in our target markets. They also reflect our ability to rapidly apply the Company's resources and intellectual property to opportunities these markets offer and our ability to deliver the quality that these markets demand.**
>
> **"Demand for Netlist memory subsystems grew in 2006, as customer requirements for higher-capacity, faster, more compact and cooler-running memory components continue to outstrip the capabilities of most suppliers," Hong continued. "Gross margins improved due to a combination of improving product mix and more efficient utilization of our manufacturing capacity. In addition, operating profitability improved as our OEM-focused business model allowed us to**

**realize revenue growth rates in excess of incremental investment in R&D and sales and marketing."**

\* \* \*

**"From a revenue standpoint, we continued to make progress throughout the year by further penetrating our current OEM customers, adding new customers, and broadening our market coverage through the continuing development of new memory technologies," stated Hong. "We attribute this growth and ongoing progress to our belief that Netlist is well positioned in the high-performance memory subsystem sector. We own proprietary technologies that, with continuing investment and the addition of larger-scale manufacturing capacity in China, will enable us to realize the opportunities offered by current and anticipated demand in our markets."**

On November 29, 2006, Netlist successfully completed an initial public offering (IPO) of 6,250,000 shares of common stock followed by an additional 937,500 shares sold by selling stockholders to underwriters to cover over- allotments.

As of December 30, 2006, cash, cash equivalents and short-term investments were $36.2 million, total assets were $87.7 million, working capital was $45.6 million, total long-term debt was $1.2 million, and stockholders' equity was $50.2 million.

\* \* \*

**For the first quarter of 2007, Netlist estimates net sales will be in the range of $40 to $42 million, and gross margin will be approximately the same as the fourth quarter of 2006. Fully diluted earnings per share for the first quarter are estimated to be in the range of $0.07 to $0.08 per share**, including estimated stock-based compensation expense of $300,000.    [Emphasis added.]

44.    Also on February 1, 2007, the Company held a conference call with financial analysts and investors to discuss the financial and operational condition of the Company.  During this call, Defendant C. Hong, in relevant part, stated:

Thank you all for joining us today for our 2006 Fourth Quarter and Year-End Call. Netlist's first earnings conference call as a public company. This afternoon we will discuss the company's results, including the key factors that we believe contributed to those

achievements and we will highlight the trends and factors we consider important for our continued success in the coming year.

Our CFO, Lee Kim, will then comment in more detail on the company's results and our financial outlook for 2007.

Before we begin, I'd like to welcome our new investors, analysts, and others who are interested in Netlist's business and prospects for future growth. **We believe our intellectual property, OEM systems expertise, high quality manufacturing, and operational flexibility position Netlist for growth and increasing profitability in our target markets.**

**To that end, the proceeds from our recently completed IPO, in which many of you participated, thank you very much, provide us with the capital resources and financial strength to take advantage of opportunities we are addressing in those markets.**

\* \* \*

**The revenue growth we reported today, for full year 2006, was achieved by further diversification of our OEM customer base and greater penetration of high end customer platforms**, while our unique memory solutions are seen as a key enabler of overall system features and functionality for a range of end users and applications.

\* \* \*

**We feel we are well positioned in our highly competitive industry because the performance requirements of top tier OEM systems are calling for memory subsystems of ever higher density, faster speed, smaller form factors, and cooler temperatures. We believe there is a gap between what these OEMs need and what the industry in general is capable of supplying.**

\* \* \*

**We also believe these markets provide us the opportunity to be incorporated into applications that have longer lifecycles and higher margin profile than for example laptop and laptop memory.**

As a result, we believe our technological capabilities in such areas as proprietary circuit designs, innovative planar solutions and thermal management will have wide applications beyond our

historic focus on the OEM server and high performance computing markets.

We will also continue to develop new technologies such as IC level logic that will provide customers with additional value in terms of system functionality, cost savings, or both. We have been testing samples of such products with customers and have begun qualification at a couple of major customers at this time.

**In addition, our strategy of engaging our customers at the earliest stages of product design has enabled us to provide maximum value to customers** in solving their memory challenges, value that translates into deeper penetration into their respective product categories, additional revenue opportunities and ultimately higher profit. [Emphasis added.]

45.    Additionally, during the February 1, 2007 conference call with financial analysts and investors, Lee Kim, the Company's Chief Financial Officer, provided the following updated financial guidance:

**Let me now take you through our outlook for the first quarter of 2007. We currently expect revenues for the first quarter of 2007 to be in the range of 40 to $42 million with gross margin remaining approximately flat with the fourth quarter of 2006.**

**Fully diluted earnings per share are expected in the range of $0.07 to $0.08 per share.** This earnings per share estimate includes the impact of estimated stock based compensation expense of $300,000. Estimated fully diluted shares for Q1 are $22 million. [Emphasis added.]

46.    On February 28, 2007, Netlist filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-K was signed by Defendants C. Hong, N. Hong, Lagatta, Portnoy, Rickey, and Romm. Therein, the Company, in relevant part stated:

**<u>Controls and Procedures</u>**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our

disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report. **Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of December 30, 2006.** [Emphasis added.]

47.    The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendant C. Hong, which stated:

I, Chun K. Hong, certify that:

1.    I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 30, 2006 of Netlist, Inc., a Delaware corporation (the "Registrant");

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.    The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and we have:

    a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    [intentionally omitted in accordance with SEC transition instructions for newly public companies]

c)    evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.    The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

* * *

In connection with the Annual Report on Form 10-K of Netlist, Inc., a Delaware corporation ("Netlist") for the fiscal year ended December 30, 2006, as filed with the Securities and Exchange Commission on February 27, 2007 (the "Report"), Chun K. Hong, president, chief executive officer and chairman of the board of Netlist, and Lee Kim, vice president, chief financial officer and secretary of Netlist, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1)   the Report fully complies with the requirements of Section
13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   the information contained in the Report fairly presents, in
all material respects, the financial condition and results of
operations of Netlist.

48.   The statements contained in ¶ 28 – 35 and 37 – 47 were materially false and
misleading when made because defendants failed to disclose or indicate the following: (1) that
the Company's growth and operational strategies were materially flawed; (2) the Company was
already experiencing the effects of an oversaturated memory chip market, and that demand for
the Company's products had deteriorated substantially; (3) that the Company's products were not
unique or well positioned in the market; (4) that the Company encouraged its largest customers
to order and maintain excess inventory so that the Company would appear financially stable; (5)
that due to these excessive inventory levels, the Company's two largest customers would be
forced to slash their product orders to return to acceptable levels; (6) that the Company
maintained a flawed pricing strategy for its products and had limited visibility as to future
product pricing; (7) that the Company's profit margins were quickly eroding in the memory chip
market; (8) that an inadequate due diligence investigation was conducted into the Company prior
to its IPO; (9) that the Company lacked adequate internal controls, and (10) that, as a result of the
foregoing, the Company's Registration Statement was false and misleading at all relevant times.

**The Truth Begins to Emerge**

49.   On April 16, 2007, Netlist issued a press release entitled "Netlist Announces
Preliminary First Quarter Results." Therein, the Company, in relevant part, stated:

Netlist, Inc. (Nasdaq: NLST), a leading supplier of high-
performance memory subsystems, today announced preliminary
results for the first quarter ended March 31, 2007. **The Company
expects to report net sales of approximately $37 million to $38
million, versus the previous guidance of $40 million to $42
million, and fully diluted earnings per share of approximately**

27

**$0.02 to $0.03 per share, including estimated stock-based compensation expense of $325,000, versus the previous guidance of $0.07 to $0.08 per share.** The Company expects gross margin for the quarter will be approximately 14.5 percent.

**Chief Executive Officer Chuck Hong commented: "Our operating results for the first quarter were adversely impacted by the oversupply of DRAM during the quarter which in turn affected the pricing and gross margin on some of the lower-ASP, high-volume products in our portfolio. We also experienced lower than expected volume of high-end products from two large customers due to reduced demand across those customers' server platforms into which our products are incorporated. Finally, our operating expenses increased as we invested in our sales, marketing and engineering teams consistent with our long-term strategy of expanding within current customers and into new markets.**

"While we are disappointed in our estimated results for the first quarter, we remain committed to our long-term strategy of developing high-performance memory subsystems that offer a superior value proposition to our OEM customers and targeting new application markets," added Hong. "We are adequately capitalized and well positioned to push forward with numerous programs that will bring high-end memory subsystem products to market though our OEM customer platforms in the second half of 2007 and we expect to return to a pattern of growth and growing margins as those products come on line."

<u>**Outlook for the Second Quarter of 2007**</u>

Based on continued softness in the DRAM market, ramp up costs related to our new manufacturing facility in China and continued incremental investment in sales, marketing and R&D, **Netlist estimates that second quarter 2007 net sales will be in the range of $34 million to $36 million, and gross margin will be in the range of 13 to 14 percent. Fully diluted earnings per share for the second quarter are estimated to be in the range of breakeven to $0.02 per share**, including estimated stock-based compensation expense of $350,000.  [Emphasis added.]

50.    On this news, shares of the Company's stock declined over 28 percent, or $1.68 per share, to close on April 17, 2007 at $4.29 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Netlist's common stock pursuant or traceable to the Company's November 30, 2006 IPO through April 16, 2007, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Netlist's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Netlist or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

> (a)    whether the federal securities laws were violated by defendants' acts as
> alleged herein;
>
> (b)    whether statements made by defendants to the investing public during the
> Class Period misrepresented material facts about the business, operations
> and management of Netlist; and
>
> (c)    to what extent the members of the Class have sustained damages and the
> proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

57.    The market for Netlist's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Netlist's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Netlist's common stock relying upon the integrity of the market price of Netlist's common stock and market information relating to Netlist, and have been damaged thereby.

58.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Netlist's common stock, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

59.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Netlist's financial well-being, business prospects, and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Netlist and its financial well-being, business prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

60.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

61.    During the Class Period, Plaintiff and the Class purchased common stock of Netlist at artificially inflated prices and were damaged thereby.  The price of Netlist's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

62.    At all relevant times, the market for Netlist's common stock was an efficient market for the following reasons, among others:

    (a)    Netlist stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    (b)    As a regulated issuer, Netlist filed periodic public reports with the SEC and the NASDAQ;

    (c)    Netlist regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)    Netlist was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

63.    As a result of the foregoing, the market for Netlist's common stock promptly digested current information regarding Netlist from all publicly-available sources and reflected such information in Netlist's stock price. Under these circumstances, all purchasers of Netlist's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

64.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Netlist who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

65.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

66.    This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's common stock pursuant to or traceable to the false Registration Statement issued in connection with the November 2006 IPO.

67.     Individual Defendants as signatories of the Registration Statement, as directors and/or officers of Netlist and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

68.     Underwriter Defendants owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

69.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

70.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public

which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

71.    As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of Netlist's common stock sold in the IPO was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of Netlist's common stock pursuant to the Registration Statement.

72.    Netlist is the issuer of the stock sold <u>via</u> the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

73.    At the times they obtained their shares of Netlist, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

74.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

75.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violation of Section 12(a)(2) of**
**<u>The Securities Act Against All Defendants</u>**

76.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

78.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Netlist Offering Registration Statement.

79.    The Netlist IPO Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

80.    Defendants owed to the purchasers of Netlist's common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

81.    Plaintiff and other members of the Class purchased or otherwise acquired Netlist's common stock pursuant to and/or traceable to the defective Registration Statement.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

82.    Plaintiff, individually and representatively, hereby offer to tender to defendants that common stock which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that common stock together with interest thereon.  Class members who have sold their

Netlist common stock are entitled to rescissory damages.

83.    By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold Netlist common stock purchased in the IPO have the right to rescind and recover the consideration paid for their Netlist common stock, and hereby elect to rescind and tender their Netlist common stock to the defendants sued herein.  Plaintiff and Class members who have sold their Netlist common stock are entitled to rescissory damages.

84.    This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
**Violation of Section 15 of The Securities Act**
**Against the Individual Defendants**

85.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

86.    This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

87.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Netlist within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Netlist to engage in the acts described herein.

88.    Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

89.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 11, 2007

**BRODSKY & SMITH, LLC**

By: _s/ Evan J. Smith, Esquire (ES3254)_
Evan J. Smith, Esquire (ES 3254)
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER LLP**
Richard A. Maniskas, Esquire
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056
_Attorneys for Plaintiffs_